IM THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
COMMERCIAL DOCKET

| | | |
|---|---|---|
| **XLC SERVICES, LLC**<br>324 W. Ninth Street<br>Cincinnati, Ohio 45202<br><br>and<br><br>**VERSATEX, LLC**<br>324 W. Ninth Street<br>Cincinnati, Ohio 45202<br><br>      **Plaintiffs,**<br><br>      v.<br><br>**ARCH INSURANCE COMPANY**<br>300 Plaza Three, 3rd Floor<br>Jersey City, NJ 07311<br><br>    Serve also:<br>    CT Corporation System, R.A.<br>    120 South Central Ave.<br>    Clayton, MO 63105<br><br>      **Defendant.** | : : : : : : : : : : : : : : : : : : : : : : : : : | Case No.<br><br>Judge _____<br><br><br><br><br><br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

XLC Services, LLC ("XLC") and Versatex, LLC ("Versatex") (collectively the "Plaintiffs") hereby bring the following Complaint against Defendant Arch Insurance Company ("Arch") and allege as follows:

### PARTIES

1. XLC is an Ohio limited liability company with its principal place of business in Hamilton County, Ohio.

2. Versatex is an Ohio limited liability company with its principal place of business in Hamilton County, Ohio

3. Arch is a foreign corporation formed under the laws of Missouri with its principal place of business in Jersey City, New Jersey.

## JURISDICTION AND VENUE

4. This Court has personal jurisdiction over Plaintiffs because they are Ohio limited liability companies that transact business in Ohio.

5. This Court has personal jurisdiction over Arch pursuant to Ohio's long arm Statute—R.C. 2307.382—because it is an insurance company licensed and authorized to do business in Ohio by the Ohio Department of Insurance, transacts business in Ohio, and has caused a tortious injury to Plaintiffs in Ohio.

6. Venue is proper in this Court pursuant to Civ.R. 3(B) because Plaintiffs have their principal place of business in Hamilton County and each regularly and systematically conducts business in Hamilton County.

## FACTUAL BACKGROUND

7. Versatex manages temporary labor and warehousing vendors needed by other commercial entities. Once such entity is The Proctor & Gamble Company ("P&G"), which owns a warehouse facility located at 6200 Bryan Park Road, Brown Summit, North Carolina (the "Property").

8. In October of 2011, Versatex and P&G entered into a contract whereby Versetex would provide certain services to P&G for its warehouse facility located on the Property (the "Warehouse"). P&G stores products and the raw materials for their products that it owns at the Warehouse.

9. In order to service its contract with P&G, Versatex engaged XLC as a subcontractor. Plaintiffs executed a contract on August 24, 2012, in which XLC agreed to provide temporary employees to Versatex to perform work at the Warehouse.

2

716735

10. Plaintiffs obtained a Commercial General Liability Policy, designated as policy number SPPKG0030603 (the "Policy") to insure its activities at the Warehouse. A true and accurate copy of the Policy is attached hereto as **Exhibit A**.

11. Plaintiffs are named insureds on the Policy. The Policy requires Arch pay sums to the Plaintiffs that they would be obligated to pay pursuant to certain contracts they entered into and based upon damage to P&G's property stored in the Warehouse. *See* **Exhibit A**.

12. On or about March 22, 2014, an accident occurred in the in the 22W16C area of the Warehouse (the "Accident").

13. At that time, only XLC employees were working in this area of the Warehouse, which contains storage racks where pallets are placed. The pallets stored in this area contain P&G raw materials used to make other products. All materials stored in this area of the warehouse are owned by P&G and are always within P&G's care, custody, and control.

14. The pallets in this area of the Warehouse are stored on warehouse racking that is divided into three levels labelled A, B, and C, with the C level being the highest level. Pallets stored on the C level of this section have the ability to come into contact with—and damage—the sprinkler system pipes.

15. At or about the time of the Accident a sprinkler pipe was damaged, subsequently burst open, and began leaking badly. This led to large amounts of water flowing out from the pipe as it was bent downward towards the floor.

16. As the water began leaking, the raw materials used for P&G's products began to get wet. The water was immediately turned off and a sprinkler technician was called to repair the sprinkler system in order to prevent further damage to P&G's property.

ELECTRONICALLY FILED 09/28/2016 10:41  /  IFIJ  /  A 1605365  /  CONFIRMATION NUMBER 558913

17. Upon information and belief, because the damaged pipe was connected to the sprinkler system, a repair was needed immediately so that water could be turned back on and to prevent a fire protection impairment or work disruption at the Warehouse.

18. P&G conducted an internal investigation and determined that the damage was caused by a forklift. XLC employees were the only forklift operators in this area. P&G also removed the damaged material from the Warehouse as well as the damaged pipe.

19. On or about March 26, 2014, Pamela Mize, a P&G SPOC, informed XLC that P&G would not hold XLC responsible for the accident. Consequently, no further report of the Accident was made by XLC at the time.

20. Nevertheless, P&G subsequently began seeking payment for its lost materials from Plaintiffs pursuant to the contract it had with Versatex and because an XLC employee caused the accident.

21. In light of the foregoing, in August of 2014, XLC management became aware of P&G's claim and timely filed a notice of occurrence with Arch (the "Claim') for the damage to the materials located at the Warehouse and began cooperating with York Risk Services Group, Inc.—Arch's agent and claims administrator ("York")—in an attempt to be paid for the Claim.

22. On August 8, 2014, York contacted XLC and d.e. Foxx & Associates, Inc. ("d.e. Foxx")—XLC's parent company and also a named insured in the Policy—and informed them that York would be the claims administrator handling the Claim. York requested the ability to review contracts between XLC and Versatex, as well as the contract between Versatex and P&G.

23. On August 22, 2014, William Kasper—York's claims adjuster assigned to investigate the Claim ("Kasper")—contacted XLC and d.e. Foxx regarding his investigation of the Claim.

4

24. On August 28, 2014, Kasper conducted an investigation at the Warehouse and on September 9, 2014, he informed d.e. Foxx that he had completed his investigation of the causation of the Accident. Kasper represented that he had forwarded his recommendation on negligence and liability and that he then needed to complete his damages analysis. At this time he had not reviewed any contracts between Plaintiffs or with P&G, but still was able to make a recommendation regarding the cause of the Accident.

25. On September 16, 2014, Kasper informed Versatex and d.e. Foxx that he had answered his own questions regarding the costs claimed and that he had presented the claim with a loss demonstrated to be $206,989.48.

26. At this time, Mr. Kasper had already represented to XLC and d.e. Foxx that he had made a determination regarding negligence and liability without reviewing any contracts. Upon information and belief, based upon the language used by the P&G employee, York and Arch began formulating arbitrary reasons with no legal justification to deny the Claim in order to prevent payment under the terms of the Policy.

27. On September 22, 2014, d.e. Foxx provided Kasper with language from the XLC contract with Versatex.

28. Although Kasper had already represented that he had concluded his investigation and made a recommendation regarding negligence and liability, York continued to delay processing the Claim and requesting copies of certain contracts be provided.

29. On October 2, 2014, York was provided a copy of the contract between Plaintiffs. In response, Kasper informed d.e. Foxx that after reviewing that contract and information regarding costs of the damaged materials he would be able to make a recommendation to the insurance underwriters. Mr. Kasper also indicated that his inability to inspect the damaged

5

property made the Claim unusual, but that his concern related to P&G's pricing and that he wanted to verify the pricing before making a recommendation.

30. On October 30, 2014, York contacted d.e. Foxx and informed it that the contract between P&G and Versatex needed to be reviewed. Additionally, York informed d.e. Foxx that it needed to determine whether an XLC employee caused the Accident or whether maintenance of the fire sprinkler pipes in the Warehouse cased the pipe to burst. Upon information and belief, this was the first time York stated a concern that an XLC employee had not caused this accident.

31. On November 4, 2014, d.e. Foxx was informed that a final liability determination had not been made because of York's inability to review the contract between P&G and Versatex. Although Kasper had been able to determine liability without reviewing any contracts, York now asserted an inability to make a decision.

32. York continued delaying making a determination over the next two months. Then, on Friday, January 9, 2015, Kasper informed XLC that he would recommend to Arch to pay the Claim, less amounts for salvage and scrap. At that time he—once again—was not questioning whether the claim should be paid and informed XLC that he would get his recommendation to Arch to pay the Claim by the following Monday.

33. Despite York's representation that the Claim would be paid, Arch continued to deny it was responsible for payment and on January 30, 2015, d.e. Foxx and XLC were provided with York's reservation of rights letter. A true and accurate copy of the January 30, 2015, reservation of rights letter is attached hereto as **Exhibit B**. According to that letter, York referred to the length of time between the Accident and submission of the Claim, its inability to inspect the sprinkler pipe, and the need to review the P&G contract.

6

ELECTRONICALLY FILED 09/28/2016 10:41 / IFIJ / A 1605365 / CONFIRMATION NUMBER 558913

34. On April 23, 2015, Arch forwarded Plaintiffs a supplemental reservation of rights letter. A true and accurate copy of the April 23, 2015, supplemental reservation of rights letter is attached hereto as **Exhibit C**. In that letter, Arch again referenced the time between the Accident and the notice of the Claim and the inability to inspect the damaged pipe.

35. The parties continued to discuss the Claim over the course of the next year. However, Arch still has failed to pay any amounts owed to Plaintiffs for the Claim despite the fact that two years have lapsed since the Claim was submitted.

36. As early as September of 2014, Arch's agent—York's claim adjuster Mr. Kasper—was able to make a determination regarding the negligence and liability of the Accident and Arch was in no way prejudiced by the lapse of time between the Accident and the Claim.

37. Arch, through its agent York, has represented to Plaintiffs that the claim will be paid but, has failed to provide any payment.

38. As its agent, York had the express and apparent authority to act on behalf of Arch, its principal.

39. Plaintiffs have cooperated with Arch and York throughout this process and complied with all requirements of the Policy, but have been unable to obtain payment for the Claim.

40. Arch has not provided any legal or reasonable justification for not paying the Claim.

41. Upon information and belief, Arch is delaying payment for an arbitrary and capricious reason in order to avoid paying a claim it has already determined it would pay.

ELECTRONICALLY FILED 09/28/2016 10:41 / IFIJ / A 1605365 / CONFIRMATION NUMBER 558913

42. Arch's has processed the Claim in an extremely reckless manner that demonstrates its conscious disregard for a great and obvious harm to Plaintiffs, the failure to pay the amounts owed on the Claim.

43. Arch has breached its contract with Plaintiffs by its failure to comply with the terms of the Policy.

44. As Arch has no reasonable justification for denial of the Claim, its failure to recognize its obligation to pay constitutes bad faith, actual malice and/or fraud, and demonstrates a willful and conscious disregard of Plaintiffs rights under the Policy.

## COUNT I – BREACH OF CONTRACT

45. The allegations contained in the preceding paragraphs are incorporated by reference herein with the same force and effect as if set forth in full below.

46. The Policy constitutes an enforceable contract between the Plaintiffs as named insureds and Arch.

47. Plaintiffs have timely performed their obligations under the Policy.

48. By failing to provide payment under the terms of the Policy, Arch has breached its insurance contract with Plaintiffs.

49. As a result, Plaintiffs have been damaged.

50. Plaintiffs are entitled to money damages to compensate them for Arch's failure to pay their claim.

## COUNT III – BAD FAITH DENIAL OF INSURANCE CLAIM

51. The allegations contained in the preceding paragraphs are incorporated by reference herein with the same force and effect as if set forth in full below.

52. As an insurer, Arch has as a duty to Plaintiffs as named insureds in the Policy to act in good faith in the handling and payment of their insurance claims.

716735

ELECTRONICALLY FILED 09/28/2016 10:41  /  IFIJ  /  A 1605365  /  CONFIRMATION NUMBER 558913

53. Arch has breached its duty to Plaintiffs because it has denied their claims for payment without a reasonable justification.

54. Arch's actions in denying Plaintiffs claims were done with ill will toward Plaintiffs and with a conscious disregard for Plaintiffs' rights under the Policy.

55. As a direct and proximate result, Plaintiffs have been damaged.

56. Plaintiffs are therefore entitled to money damages and punitive damages to compensate them for Arch's failure to pay their claim and the manner in which the claim has been processed.

**WHEREFORE**, by virtue of the foregoing acts complained of, Plaintiffs demand:

1. Compensatory damages in an amount to exceed $25,000.00 to be determined at trial;

2. Punitive damages;

3. All attorneys' fees incurred by Plaintiffs in bringing this action;

4. Any and all pre-and post-judgment interest permitted by law; and

5. Such other and further relief as the Court deems appropriate

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable in this matter.

9

716735

        Respectfully submitted,

        */s/ Russell S. Sayre*
_____
Russell S. Sayre (0047125)
Alex E. Wallin (0091289)
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
sayre@taftlaw.com
awallin@taftlaw.com
Tel: 513-381-2838
Fax: 513-381-0205

ATTORNEYS FOR PLAINTIFFS
XLC SERVICES, LLC and VERSATEX, LLC

10

ELECTRONICALLY FILED 09/28/2016 10:41  /  IFIJ  /  A 1605365  /  CONFIRMATION NUMBER 558913

## INSTRUCTIONS TO THE CLERK

Please serve a copy of the Complaint and Summons via certified mail, return receipt requested, upon the defendant as listed in the caption.

/s/ Russell S. Sayre

716735

ELECTRONICALLY FILED 09/28/2016 10:41 / IFIJ / A 1605365 / CONFIRMATION NUMBER 558913